1   RICHARD M. HUMES
    MELINDA HARDY
2   KEVIN D. SOLONSKY
    Securities and Exchange Commission
3   100 F Street, NE
    Washington, DC 20549-9612
4   Telephone:  (202) 551-5014
    Facsimile:   (202) 772-9263
5
    Counsel for the Securities and Exchange Commission
6

7              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
8

9   _____
                                          :
10  KENT D. NELSON,                       :
                                          :
11           Movant,                      :
                                          :
12       v.                               :        5:08-mc-80080-JF
                                          :
13  UNITED STATES SECURITIES              :
    AND EXCHANGE COMMISSION,              :
14                                        :
             Respondent.                  :
15  _____:

16           VERIFIED OPPOSITION OF RESPONDENT
         UNITED STATES SECURITIES AND EXCHANGE COMMISSION
17  TO MOTION FOR ORDER PURSUANT TO CUSTOMER CHALLENGE
    PROVISIONS OF THE RIGHT TO FINANCIAL PRIVACY ACT OF 1978
18

19                        **INTRODUCTION**

20       Kent D. Nelson ("Nelson") has moved this Court, pursuant to the customer

21  challenge provisions of the Right to Financial Privacy Act of 1978 ("RFPA"), 12

22  U.S.C. 3401 et seq., for an order quashing an investigative subpoena issued March

23  24, 2008, by Securities and Exchange Commission ("SEC") staff ("Staff"), seeking

24  the bank records of Nelson and his wife Wendy L. Nelson at Wells Fargo Bank

25  ("Wells Fargo") in connection with an SEC investigation.  This Court should enforce

26  the subpoena because the subpoena complies with the RFPA's notice requirements

27  and the bank records sought are relevant to a legitimate law enforcement

28

                      **5:08-mc-80080-JF Verified Oppos. of Respondent**

-2-

investigation. 1/

## BACKGROUND

### I.   NELSON PLEADS GUILTY TO PARTICIPATING IN ILLEGAL KICKBACK SCHEME.

From 1999 to 2005, Kent served as an investment advisor to the New Mexico State Treasurer's Office ("NMSTO"). 2/ See Exhibit 1 at 3-5 (9/14/05 Plea Agreement between Kent and New Mexico U.S. Attorney's Office, U.S. v. Nelson, No. 05 Crim. 2021 (D.N.M., 2005)). 3/ Investment advisors provide advice to clients on investing in securities, and are regulated by the SEC and required to be registered with the SEC. See Section 202(a)(11) of the Investment Advisers Act of 1940 ("Investment Advisers Act"). During this period, Nelson paid secret, illegal kickbacks to two successive State Treasurers, Michael Montoya and Robert Vigil. Id. Nelson paid the kickbacks initially to Angelo Garcia, a local Albuquerque businessman, who in turn split the kickbacks between himself, Montoya, Vigil, and

---

1/   Because financial institutions may not disclose records sought until the Government has certified in writing that it has complied with the RFPA, 12 U.S.C. 3403(b), the filing of a customer challenge automatically stays production of the subpoenaed records. To minimize delay to agency investigations, the RFPA requires a court to rule upon a customer challenge within seven days after the Government files its response to a motion to quash. 12 U.S.C. 3410(b); SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 746 (1984).

2/   As required by the RFPA, 12 U.S.C. 3410(b), the facts in this Opposition are verified by Allison H. Lee, an attorney with the SEC's Division of Enforcement, who is one of the persons designated by the SEC to perform all duties in connection with this investigation, including the issuance of subpoenas. See 15 U.S.C. 78u(b).

3/   The Plea Agreement says "Sealed" on the front. On September 21, 2005, the filings in the case were ordered unsealed.

-3-

Leo Sandoval, a co-conspirator. Id. Nelson paid the kickbacks so that he would receive work as an investment advisor from the NMSTO. Id. From 1999 to 2005, Nelson received $4.5 million in investor advisor fees from the NMSTO and returned $2.9 million in kickbacks to Garcia. Id.

The FBI and New Mexico U.S. Attorney's Office discovered the kickback scheme during an extensive investigation of corruption of the NMSTO. The investigation led to the criminal prosecution of Nelson, Garcia, Montoya, and Vigil. On September 14, 2005, Nelson pled guilty to a federal charge of mail fraud based on the illegal kickback scheme. See Exh. 1. On September 12, 2007, Nelson was sentenced to three years in prison, fined $175,000, and ordered to forfeit a condominium he owned. In 2006, Nelson was indicted by the State of New Mexico on charges relating to the same conduct. The State charges against Nelson are pending.

## II.   THE SEC SEEKS NELSON'S BANK RECORDS IN CONNECTION WITH ITS INVESTIGATION OF SECURITIES VIOLATIONS RELATING TO KICKBACK SCHEME.

On February 9, 2006, the SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony ("Formal Order") in the case, In the Matter of State of New Mexico Investments (D-2761). The Formal Order directs Staff to conduct an investigation to determine whether certain persons violated federal securities laws in connection with the NMSTO kickback scheme. 4/ The Formal Order authorizes Staff to issue subpoenas for documents and to take

---

4/    Specifically, the Formal Order directs Staff to investigate possible violations of Section 17(a) of the Securities Act of 1933; Sections 10(b), 15(b)(4)(E), 15(c)(1)(B), 15B(c)(1), and 17(a)(1) of the Securities Exchange Act of 1934; Rules 10b-5, 17a-3, and 17a-4 promulgated thereunder; Sections 203(e)(6), 204, 206(1), 206(2), and 207 of the Investment Advisers Act; and Municipal Securities Rulemaking Board Rules G-8, G-17, G-20, and G-37.

**5:08-mc-80080-JF Verified Oppos. of Respondent**

-4-

testimony in connection with its investigation. See 15 U.S.C. 77s(b), 78u(b).

On March 24, 2008, Staff issued a subpoena to Wells Fargo, pursuant to the Formal Order. The subpoena requested bank records of Nelson and his wife from January 2007 to the present. The SEC sent separate notifications to Nelson and his wife. Nelson's wife has not challenged the subpoena. Nelson is imprisoned at the U.S. Penitentiary in Lompoc, California and filed his motion to quash the subpoena on April 11. 5/ The SEC seeks the subpoenaed records in order to identify the location of assets for penalty and disgorgement purposes.

## ARGUMENT

### I.   THE SUBPOENAED RECORDS ARE RELEVANT TO A LEGITIMATE LAW ENFORCEMENT INVESTIGATION.

The RFPA provides the "sole" means by which a customer may challenge the disclosure of materials subpoenaed from a customer's bank. 12 U.S.C. 3410(e); SEC v. Jerry T. O'Brien, Inc., 467 U.S. 735, 745-46 (1984). Under the RFPA, a court must deny a customer challenge to a subpoena issued pursuant to the RFPA if the Government establishes the relevance of the subpoenaed documents to a legitimate law enforcement inquiry. 12 U.S.C. 3410(c). "Upon finding that there is a demonstrable reason to believe that the agency is conducting a legitimate law enforcement inquiry and that the records sought are relevant to that inquiry, the court 'shall deny the motion to quash.'" Sandsend Financial Consultants, Ltd v. Federal Home Loan Bank Board, 878 F.2d 875, 877 (5th Cir. 1989), quoting,12 U.S.C. 3410(c) (emphasis in original). See also Grafstram v. SEC, 532 F. Supp. 1023, 1025 (S.D.N.Y. 1982). As demonstrated below, the SEC's investigation is clearly a legitimate law enforcement inquiry and the subpoenaed records are clearly relevant

---

5/   As Nelson's wife waived any challenge to her bank records by not filing a challenge, the only documents that are currently subject to challenge are those in Nelson's name or those jointly in Nelson's name and his wife's name.

-5-

to the SEC's investigation.

### A.    The SEC's Investigation Is A Legitimate Law Enforcement Inquiry.

The SEC's investigation is a legitimate law enforcement inquiry and Nelson does not and could not assert otherwise. The SEC is directly empowered by Section 20(a) of the Securities Act, 15 U.S.C. 77t(a), and Section 21(a) of the Exchange Act, 15 U.S.C. 78u(a), to undertake investigations to determine whether violations of the federal securities law have occurred. The Formal Order was entered pursuant to these statutory provisions and provides more than a "demonstrable reason to believe that the law enforcement inquiry is legitimate." Rodriguez v. FSLIC, 712 F. Supp. 159, 162 (N.D. Cal. 1989). See also Pennington v. Donovan, 573 F. Supp. 708, 709 (S.D. Tex. 1983) ("An investigation is legitimate if it is one the agency is authorized to make and is not being conducted solely for an improper purpose such as political-harassment or intimidation or otherwise in bad faith"); Dawar v. HUD, 820 F. Supp. 545, 547 n.2 (D. Kan. 1993) (same).

### B.    The Subpoenaed Documents Are Relevant To The SEC's Investigation.

Relevance in the RFPA context is broad, as it is whenever agency investigative subpoenas are challenged. See Casey v. FTC, 578 F.2d 793, 799 (9th Cir. 1978) ("FTC subpoena must be enforced if the information sought is 'not plainly incompetent or irrelevant to any lawful purpose' of the FTC"). The subpoenaed information is relevant if it "touches a matter under investigation," Sandsend, 878 F.2d at 882, or "'might throw light' on a matter germane to the Commission's inquiry." CFTC v. Catalano, 1981 U.S. Dist. LEXIS 15728, *2 (N.D. Ill.); see also In re John Doe, 1990 WL 119321, *2 ("the statute does not require the agency to show that the records are relevant but rather that there is a 'reasonable belief that the records sought are relevant'"); United States v. Wilson, 571 F. Supp. 141, 142

-6-

(S.D.N.Y. 1983) ("the RFPA requires only that financial information be relevant to a 'legitimate law enforcement inquiry,' and not relevant in a narrow, evidentiary sense").

Here, the SEC has a reasonable belief that the subpoenaed bank records are relevant to its investigation. The SEC seeks the records to help Staff trace the proceeds of possibly illegal transactions for disgorgement purposes. The staff seeks to locate the net proceeds ($1.6 million) that Nelson obtained from the NMSTO ($4.5 million received minus $2.9 million returned as kickbacks) so that it can recoup the money defrauded from the State of New Mexico through orders of disgorgement. Since it is a basic principle of securities investigations that one "follows the money," see, e.g., Panaro v. SEC, 1987 U.S. Dist. LEXIS 16810, *2 (E.D.N.Y. Aug. 5, 1987), Nelson's account records are clearly relevant to this investigation. See also Rodriguez, 712 F. Supp. at 162 (bank records tracing proceeds from illegal transactions deposited to an individual's bank account are relevant to investigation). The SEC also seeks the records in order to determine what resources Nelson possesses for purposes of issuing penalties against Nelson.

## II.    NELSON'S ARGUMENTS LACK MERIT.

Nelson argues that the SEC's subpoena should be quashed because the services he provided to the NMSTO did not qualify as financial advisory services. Nelson's argument lacks merit because his assertion is irrelevant to the SEC's investigation. The SEC is investigating whether Nelson violated the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934 by employing devices, schemes, or artifices to defraud clients in connection with the purchase, sale, or offer of securities, and whether Nelson violated registration and other provisions of the Investment Advisers Act by misrepresenting material facts in connection with the NMSTO kickback scheme. Staff believes that Nelson violated

-7-

all of these provisions.  In fact, in the attached Plea Agreement, Nelson admits that he received $4.5 million from the NMSTO in connection with serving as an investment advisor to the NMSTO and that he shared these fees with co-conspirators in order to buy influence over the NMSTO's discretionary spending of funds.  Exh. 1 at 3-5.  Accordingly, the SEC has a reasonable belief that Nelson's bank records are relevant to its investigation.

Nelson also argues that the records sought (January 2007 to the present) are irrelevant to the SEC investigation because Nelson stopped doing business with the NMSTO in 2005.  Although Nelson correctly states that he stopped providing services to the NMSTO in 2005, his argument lacks merit because the SEC seeks the documents to identify the location of assets for purposes of disgorgement and penalties, and not to prove Nelson's culpability.  Staff needs the documents to learn how much money Nelson currently possesses and the location of money he received from the NMSTO.  Documents from 2007 to the present, therefore, are key to the present inquiry.

## CONCLUSION

For the foregoing reasons, this Court should deny Nelson's motion to quash the subpoena issued to Wells Fargo Bank.

**5:08-mc-80080-JF Verified Oppos. of Respondent**

-8-

Respectfully submitted,


RICHARD M. HUMES
Associate General Counsel

MELINDA HARDY
Assistant General Counsel

*[signature]*

KEVIN D. SOLONSKY
Senior Counsel

Securities and Exchange Commission
100 F Street, NE,
Washington, D.C.  20549-9612
(202) 551-5014

Attorneys for Respondent
Securities and Exchange Commission

Dated:      May 6, 2008

# EXHIBIT 1

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

FOR THE DISTRICT OF NEW MEXICO

SEP 1 4 2005

MATTHEW J. DYKMAN
CLERK

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 05-2021 JP |
| | ) | |
| KENT NELSON, | ) | |
| | ) | |
| Defendant. | ) | |

*Sealed*

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties hereby notify the Court of the following agreement between the United States Attorney for the District of New Mexico, the defendant, **KENT NELSON**, and the defendant's counsel, Michael Oppenheimer, Esq.:

### REPRESENTATION BY COUNSEL

1.     The defendant understands his right to be represented by an attorney and is so represented.  The defendant has thoroughly reviewed all aspects of this case with his attorney and is fully satisfied with that attorney's legal representation.

### RIGHTS OF THE DEFENDANT

2.     The defendant further understands his rights:

a.     to be charged and prosecuted by indictment;

b.     to plead not guilty;

c.     to have a trial by jury;

d.     to confront and cross-examine witnesses and to call witnesses in his defense;

e.    against compelled self-incrimination; and,

f.    the right to limit restitution to the count of conviction.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.    The defendant hereby agrees to waive these rights and to plead guilty to

a one-count Information to be filed charging violation of 18 U.S.C. § 1341, that being

mail fraud.

## SENTENCING

4.    The defendant understands that the maximum penalty the Court can

impose is:

a.    imprisonment for a period of not more than twenty (20) years;

b.    a fine not to exceed the greater of $250,000.00 or twice the pecuniary gain to the defendant or pecuniary loss to the victim;

c.    a mandatory term of supervised release of not more than three (3) years that must follow any term of imprisonment. (If the defendant serves a term of imprisonment, is then released on supervised release, and violates the conditions of supervised release, the defendant's supervised release could be revoked--even on the last day of the term--and the defendant could then be returned to another period of incarceration and a new term of supervised release.);

d.    a mandatory special penalty assessment of $100.00; and

e.    restitution as may be ordered by the Court.

5.    Sentencing is pursuant to the Sentencing Reform Act of 1984. The

parties recognize that the United States Sentencing Guidelines are advisory, and that

the Court is required to consider them in determining the sentence it imposes.

## STATEMENT OF FACTS

6.    The defendant stipulates to the following facts:

a.    By my signature on this plea agreement, I am acknowledging that I am pleading guilty because I am, in fact, guilty of the offense charged against me in the Information. I recognize and accept responsibility for my criminal conduct. Moreover, in pleading guilty, I acknowledge that if I chose to go to trial instead of entering this plea, the United States could prove facts sufficient to establish my guilt of the charge in the Information beyond a reasonable doubt. I specifically admit the following facts and relevant conduct related to the charge against me, and declare under penalty of perjury that all of these facts are true and correct.

b.    In 1999, I was appointed as Investment Advisor to the New Mexico Office of State Treasurer. The process of applying to become an Investment Advisor was competitive, and I had no prior experience with investments by state or local governments, but I was assisted in my application by the Office of State Treasurer itself and by one Angelo Garcia. Mr. Garcia told me that he had the ear of the Treasurer of the State of New Mexico, who was then Michael Montoya. Mr. Garcia assured me that I would receive the appointment. The fact that I was indeed appointed as Investment Advisor confirmed my understanding that Mr. Garcia was in a position to influence decisions by the Treasurer of the State of New Mexico.

c.    As an Investment Advisor, I assisted the New Mexico Office of State Treasurer with the investment of state funds, often by finding securities brokers with whom to place state bond proceeds. I was paid commissions by securities brokers who were successful in obtaining investments of State of New Mexico funds. During

3



the period June 2000 to March 2005, I received approximately $4,414,337.34 in such *fees or* commissions.

      d.    By the time I received my first commission payment from a brokerage firm in connection with the successful placement of funds under the control of the New Mexico Office of State Treasurer, I understood that I would be required to share my commission fees in order to continue receiving work as Investment Advisor. I was repeatedly told that the Office of State Treasurer had other means of investing the funds under its control apart from my services, and I believed that the Treasurer of the State of New Mexico had substantial discretion in the decision of whether to use me or not for any given potential investment.

      e.    For the most part, but with a few exceptions, the manner in which I would share my fees was that I would send them via wire transfer to Angelo Garcia or to accounts I believed to be controlled by him. Often I would transfer some seventy-five percent of my fees in this fashion. I did not know precisely what Mr. Garcia did with the money after he received it. I believed, however, that it was to my benefit to share my fees in this fashion. I believed that I was coming out ahead monetarily, even after the loss of up to seventy-five percent of my fees. I believed that I was buying access to the Treasurer of the State of New Mexico, and that I was buying influence over his discretionary commitment of funds, increasing the likelihood that he would use me to invest state funds.

      f.    My activities as Investment Advisor, and the process by which I shared my fees, continued substantially similarly after Michael Montoya left office and Robert Vigil became Treasurer of the State of New Mexico in 2004. Mr. Garcia advised

4

me that some of the fees I transferred to him were used to pay campaign expenses of
Mr. Vigil. There were also a few instances of my directly paying campaign expenses on
behalf of Mr. Vigil. By and large, however, I continued transferring my fees to Mr.
Garcia.

g.    As noted above, I received approximately $4,414,337.34 in
commissions on State of New Mexico investments during the period June 2000 to
March 2005. During this same period, I transferred $2,913,546.00 to Angelo Garcia.
The money transferred to Mr. Garcia represented approximately two-thirds of my
commissions.

h.    My payments to Mr. Garcia, for the purpose of influencing the
decisions of the Treasurer of the State of New Mexico with respect to the investment of
funds under his control, constituted a scheme and artifice to deprive the people of the
State of New Mexico of the intangible right of honest services of their public officials, all
within the meaning of Title 18, United Stated Code, Sections 1341 and 1346.

i.    In furtherance of this scheme and artifice, and to achieve the
objects thereof, on or about February 27, 2003, I mailed or caused to be mailed to
Michael Montoya a check in the amount of $5,000.00, payable to Mr. Montoya.

7.    By signing this agreement, the Defendant admits all the foregoing
facts. The Defendant understands and agrees that the Court may rely on any of these
facts to determine the Defendant's sentence, including, but not limited to, the advisory
guideline offense level (including any facts that support any specific offense
characteristic, cross reference, upward adjustment, or upward departure).

5

8.    It is expressly understood and agreed by and between the defendant and the United States that:

a.    The United States has made, and will make, NO AGREEMENT pursuant to Rule 11(c)(1)(C), Fed. R. Crim. P., that a specific sentence is the appropriate disposition of this case.

b.    The United States has made, and will make, NO AGREEMENT to approve, to oppose, or not to oppose pursuant to Rule 11(c)(1)(B), Fed. R. Crim. P., any request made by the defendant or on behalf of the defendant for a particular sentence in this case.

c.    The United States hereby expressly reserves the right to make known to the United States Probation Office, for inclusion in the presentence report prepared pursuant to Rule 32, Fed. R. Crim. P., any information that the United States believes may be helpful to the Court.

## STIPULATIONS

9.    The United States and the defendant stipulate as follows:

a.    Pursuant to U.S.S.G. § 3E1.1, the defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. Consequently, the defendant is entitled to a reduction of three levels from the base offense level as calculated under the sentencing guidelines. This reduction is contingent upon the defendant providing an appropriate oral or written statement to the United States Probation officer who prepares the presentence report in this case in which the defendant clearly establishes his entitlement to this reduction.

6

b.      For purposes of U.S.S.G. § 2C1.1(b)(2) (2004 edition) and the

calculation of relevant conduct for sentencing purposes, the value of the payments that

the defendant made to public officials or to others acting with public officials was more

than $2,500,000.00 but not more than $7,000,000.00.

10.      The United States and the defendant understand that the above

stipulations are not binding on the Court and that whether the Court accepts these

stipulations is a matter solely within the discretion of the Court after it has reviewed the

presentence report. The defendant understands and agrees that if the Court does not

accept any one or more of the above stipulations, the defendant hereby waives the right

to appeal the Court's rejection of such stipulations.

## DEFENDANT'S ADDITIONAL OBLIGATIONS

11.      The defendant understands his obligation to provide the United States

Probation Office with truthful, accurate, and complete information. The defendant

hereby represents that he has complied with and will continue to comply with this

obligation.

12.      The defendant hereby agrees that:

a.      The defendant will cooperate with the United States by giving

truthful and complete information and/or testimony concerning his participation in and

knowledge of criminal activities. The defendant understands that if he falsely implicates

an innocent person in the commission of a crime or exaggerates the involvement of any

person in the commission of a crime in order to appear cooperative, or if the defendant

falsely minimizes the involvement of any person in the commission of a crime in order

to protect that person, then the defendant will be in violation of this plea agreement, and

7

the United States will have the right to rescind the plea agreement and institute criminal proceedings against the defendant.

      b.      The defendant will testify truthfully if called as a witness in any state or federal grand jury investigation and/or any civil or criminal proceeding brought in the District of New Mexico or elsewhere.

      c.      If requested to do so by the United States Attorney's Office, the defendant will provide all documents, records, writings, tangible objects, or materials of any kind that are in his possession or under his custody or control and that relate directly or indirectly to any area of inquiry or investigation in this proceeding.

      d.      If requested to do so by the United States Attorney's Office, the defendant will submit a personal financial statement under oath and/or submit to interviews by the United States Attorney's Office regarding his capacity to satisfy any fines and/or restitution.

      e.      If, as determined by the United States in its sole discretion, the defendant successfully completes his cooperation as described above, the United States will move, pursuant to U.S.S.G. § 5K1.1, to have the Court downwardly depart from the applicable guideline sentence. The defendant understands, however, that the decision whether to depart downwards, as well as the amount of any departure, is solely within the discretion of the Court.

8

## FORFEITURE

13.    The defendant agrees to cooperate fully in helping the United States  to

locate and identify any asset derived from or used in the commission of the offenses in

this case.  The defendant further agrees to cooperate fully in helping the United States

locate, identify, and obtain possession and/or ownership of any other assets about

which he may have knowledge that were derived from or used in the commission of

offenses committed by other persons.

14.    The defendant agrees that he will forfeit to the United States all of his

right, title, and interest in the following assets and properties:

    a.    The condominium unit known as Unit 111 at 457 Mountain Village

Boulevard, located in Mountain Village, San Miguel County, Colorado.

## WAIVER OF APPEAL RIGHTS

15.    The defendant is aware that Title 18, United States Code, Section 3742

affords a defendant the right to appeal the sentence imposed.

    a. Acknowledging that, the defendant knowingly waives the right to

appeal any sentence within the guideline range applicable to the statute of conviction

as determined by the Court after resolution of any objections by either party to the

Presentence Report to be prepared in this case, and the defendant specifically agrees

not to appeal the determination of the Court in resolving any contested sentencing factor.

## GOVERNMENT'S AGREEMENT

16.    Provided that the defendant fulfills his obligations as set out above, the United States agrees that:

a.    The United States will not bring additional criminal charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico.

b.    This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

17.    The defendant agrees and represents that this plea of guilty is freely and voluntarily made and not the result of force or threats or of promises apart from those set forth in this plea agreement.  There have been no representations or promises from anyone as to what sentence the Court will impose.

## VIOLATION OF PLEA AGREEMENT

18.    The defendant understands and agrees that if he violates any provision of this plea agreement, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the

10

Information to be filed in this case, as well as perjury, false statement, and obstruction of justice, and to additional criminal or civil forfeiture proceedings.

## SPECIAL ASSESSMENT

17.    At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the **United States District Court**, District of New Mexico, 333 Lomas Blvd. N.W., Suite 270, Albuquerque, New Mexico 87102, in the amount of $100.00 in payment of the special penalty assessment described above.

## ENTIRETY OF AGREEMENT

18.    This document is a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.

AGREED TO AND SIGNED this 14th day of _September_, 2005.

DAVID C. IGLESIAS
United States Attorney


Jonathon M. Gerson
Assistant United States Attorney
201 Third Street N.W., Suite 900
Post Office Box 607
Albuquerque, New Mexico  87102
(505) 346-7274

11

I have read this agreement and carefully reviewed every part of it with my attorney. I understand the agreement and voluntarily sign it.

KENT NELSON
Defendant

Michael Oppenheimer, Esq.
Attorney for Defendant

12